UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:18-CR-050 |
| | ) | |
| MICHAEL ARTHUR NIXON | ) | |

## SENTENCING MEMORANDUM IN SUPPORT OF DEFENDANT MICHAEL ARTHUR NIXON'S OBJECTIONS TO AUGUST 9, 2019 PRESENTENCE INVESTIGATION REPORT

Pursuant to Federal Rule of Criminal Procedure 32, Defendant Michael Arthur Nixon (hereinafter "Defendant") files this Sentencing Memorandum in Support of hi Objections to the August 9, 2019 Presentence Investigation Report,[1] representing to the Court as follows:

## INTRODUCTION TO OBJECTIONS

As this Court is well-aware, the Sentencing Guidelines are merely advisory and are in no way binding upon the Court. *See United States v. Booker,* 543 U.S. 220 (2005). Instead, 18 U.S.C. § 3553(a) governs sentencing and establishes the Court's obligation to impose a sentence which is sufficient, but not greater than necessary to comply with the following purposes:

1.   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

2.   to afford adequate deterrence to criminal conduct;

3.   to protect the public from further crimes of the defendant; and

4.   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.

---

[1] A previous Presentence Investigation Report was issued on June 28, 2019. Both Defendant and the Government filed objections thereto.

*See* 18 U.S.C. § 3553(a)(2)(A)-(D).  Still, the Court should unquestionably begin every sentencing proceeding by **correctly** calculating the Guideline range.  *Gall v. United States,* 128 S.Ct. 586, 596 (2007).

As set forth herein, the Probation Office's calculation of the Guideline range in this case is incorrect. First, there is no adequate factual basis to support the Probation Office's determination that Defendant can be attributed 300 ounces (8.5 kilograms) of cocaine hydrochloride as relevant conduct in connection with the charged offense.  In particular, Defendant objects to Paragraphs 21-24 of the Presentence Investigation Report, as well as the Offense Level Computations contained at Paragraphs 30, 35, and 39 that are derived therefrom.  Defendant submits that absolutely no more than 3.6 kilograms could be attributed to him under the evidence, and because that figure likely is inflated due to double-counting, as discussed *infra*, a weight of 2.0 kilograms is the most appropriate approximation of Defendant's role in the conspiracy.  Second, there is not an adequate factual basis to support the Probation Office's determination that Defendant's offense level should be increased by two (2) levels pursuant to U.S.S.G. § 2D1.1(b)(12).  Specifically, there is not an adequate factual basis to support a determination that Defendant maintained the premises at 614 Old CCC Road, Brunswick, Georgia primarily for drug distribution.  Defendant therefore objects to the two-point enhancement attributed to Defendant at Paragraph 31 of the Presentence Investigation Report, as well as the Offense Level Computations contained at Paragraphs 35 and 39 that are derived therefrom.

Accordingly, with adjustment to correct the attributed weight of cocaine hydrochloride to 2.0 kilograms, and removal of the two-point enhancement under U.S.S.G. § 2D1.1(b)(12), the correct base offense level is not more than 26, the total offense level is not more than 23, and the guideline range is not more than 70-87 months.

## ARGUMENT AND CITATION TO AUTHORITY

With respect to factual assertions contained in the Presentence Investigation Report, "the Sentencing Guidelines require a district court, at the sentencing stage, to make independent findings establishing the factual basis for its Guideline calculations." *United States v. Hamaker,* 455 F.3d 1316, 1338 (11th Cir. 2006). A Presentence Investigative Report is not evidence. *United States v. Poor Bear,* 359 F.3d 1038, 1041 (8th Cir. 2004). But, "'[a] sentencing court may accept the facts in a [Presentence Investigation Report] as true unless the defendant objects to specific factual allegations.'" *United States v. Wintermute,* 443 F.3d 993, 1005 (8th Cir. 2006) (emphasis added). However, "[i]f the defendant objects to any of the factual allegations contained [in the Presentence Investigation Report] on an issue on which the government has the burden of proof, such as the base offense level and any enhancing factors, the government must present evidence at the sentencing hearing to prove the existence of the disputed facts." *Poor Bear,* 359 F.3d at 1041. "The district court cannot rely on facts at sentencing that have not been proved by a preponderance of the evidence." *Id.* (citing *United States v. Hammer,* 3 F.3d 266, 272 (8th Cir.1993)); *accord United States v. Perez-Oliveros,* 479 F.3d 779, 783 (11th Cir. 2007). Otherwise, the sentence is in error and must be vacated and remanded for resentencing. *Wintermute,* 443 F.3d at 1005.

I.   **The Probation Office Has Not Presented Reliable and Specific Evidence Supporting its Attribution to Defendant of a Weight of 300 ounces (8,505 grams or 8.5 kilograms) of Cocaine Hydrochloride.**

The Eleventh Circuit has made clear that the sentencing court's duty to ensure that the Government carries its burden by presenting reliable and specific evidence in support of its attributing 8.5 kilograms of cocaine hydrochloride to Defendant is critical, stating:

> [T]he Guidelines do not reduce district court judges to mere automatons, passive compilers of ciphers, or credulous naifs who must accept as canon all that which is

presented to them regarding a defendant's involvement in the crime charged or conduct relevant thereto.

> To be sure, the preponderance of the evidence standard . . . does not relieve the sentencing court of the duty of exercising the critical fact-finding function that has always been inherent in the sentencing process. . . . [I]t is a recognition of the fact that if the probation officer and the prosecutor believe that the circumstances of the offense, the defendant's role in the offense, or other pertinent aggravating circumstances, merit a lengthier sentence, they must be prepared to establish that pertinent information by evidence adequate to satisfy the judicial skepticism aroused by the lengthier sentence that the proffered information would require the district court to impose.

*United States v. Wise,* 976 F.2d 393, 402-03 (8th Cir.1992), *cert. denied,* 507 U.S. 989 (1993).

Under the Guidelines, a defendant is only legally culpable at sentencing for "relevant conduct" as that term is defined by U.S.S.G. § 1B1.3.  Pursuant to U.S.S.G. § 1B1.3, relevant conduct, including: (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

(i)   within the scope of the jointly undertaken criminal activity,

(ii)   in furtherance of that criminal activity, and

(iii)   reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

*See* U.S.S.G. § 1B1.3(a)(1)(B).  The commentary to U.S.S.G. § 1B1.3 makes clear that: "[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability."  Instead, "[u]nder subsections (a)(1) and (a)(2), **the focus is on the specific acts and omissions for which the defendant is to be held accountable**

in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." *Id.* (emphasis added).  In other words, for the purposes of the Guidelines, "relevant conduct" is limited to a defendant's actual participation in furtherance of the offense conduct under U.S.S.G. § 1B1.3(a)(1)(A), or in the context of a jointly undertaken enterprise, the conduct of other members of the conspiracy that was "within the scope of the conspiracy, in furtherance of the jointly undertaken criminal activity, and reasonably foreseeable" to the defendant under U.S.S.G. § 1B1.3(a)(1)(2).  Because U.S.S.G. § 1B1.3 calls for a factual finding that certain conduct is "relevant" to the offense of conviction, a sentencing court should make explicit relevant-conduct findings in order to facilitate appellate review. *See e.g. United States v. Valarezo–Orobio,* 635 F.3d 1261, 1264 (11th Cir. 2011) (explaining that whether an act "qualifies as relevant conduct is a question of fact"); *United States v. Bradley,* 644 F.3d 1213, 1293 (11th Cir. 2011) (explaining that "a district court should make explicit [those] factual findings that underpin its sentencing decision").

The Probation Office originally issued a Presentence Investigation Report attributing Defendant with a total of only 3.91 kilograms of cocaine hydrochloride.  *See* June 28, 2019 PSR, at ¶ 21.  The Probation Office derived this total from **the exact same evidence** on which it now bases its greater figure of 8.5 kilograms.  *Compare id.* ("This total is derived from the interviews with Robert Johnson, Jr.  In an effort to remain conservative, and avoid double counting, the probation officer has not attributed any additional corroborative quantities identified through the wiretap, the search warrant, or the interview with John Buckley."), *with* Aug. 9, 2019 PSR, at ¶ 24 ("In calculating this total [of 8.5 kilograms], the probation officer considered the "seizures in this case, information obtained through wire intercepts, and interviews with Robert Johnson, Jr.  In an effort to remain conservative, and avoid double counting, the probation officer has not attributed

5

any additional corroborative quantities identified through the wiretap, the search warrant, or the interview with John Buckley."). There is no reasonable explanation to support this increase based on the same evidence, much less a preponderance of the evidence.

Even more troubling, however, is that the proffer interviews with Robert Johnson, Jr. – the primary evidence upon which the Probation Office appears to base its weight calculations – are completely unreliable and objectively untrue. Johnson stated that Defendant "was **released from federal custody June 2017**, at which time Nixon and "Prime" partnered and visited Johnson on a weekly basis to purchase 18 ounces (510.3 grams of cocaine hydrochloride)." *Id.* at ¶ 21 (emphasis added). Johnson's statement is objectively untrue as Nixon was still in federal custody in June of 2017 and under federal supervision and ankle monitoring until October of 2017. Indeed, the Probation Office acknowledged as much in a July 25, 2019 email to Counsel for Defendant acknowledging that the concerns about the veracity of Johnson's proffer statements were warranted, stating:

> I spoke with the counselor at Dismas this afternoon regarding Mr. Nixon. She needs to pull Mr. Nixon's file out of storage too look into a few things further, but in speaking with her I believe your concerns are warranted regarding the statements about Mr. Nixon. She needs to verify any passes he may have had to leave the facility, but in speaking with her and speaking with one of the supervision officers here, they are in agreement with you that he would not have traveled to Jacksonville during the time period he was on electronic monitoring. I will get back in touch with you once she had reviewed his file. I believe after she contacts me it would beneficial for a conversation between you, Ms. Kirkland, and myself. Thank you.

*See* **Exhibit A** (true and correct copy of July 25, 2019 e-mail). The Probation Office followed up with a August 12, 2019 e-mail to Counsel for Defendant, stating:

> [T]he concluding sentence of paragraph 21 has been updated to read, "It should be noted, Nixon was a resident at Dismas Charities halfway house, Savannah, from **April 11, 2017, through October 4, 2017**. According to representatives at Dismas Charities, Nixon was on GPS monitoring for the duration of his supervision at Dismas Charities halfway house. For that reason, the probation officer did not attribute any drug weight based on statements made regarding that time period.

**Exhibit B** (true and correct copy of Aug. 12, 2019 e-mail) (emphasis added).  The Probation Office therefore has acknowledged that at least some of Robert Johnson's statements were **<u>patently false</u>**, but attempts to cure this by stating that no weight was attributed to Defendant based on statements made in that six-month time period fail.  *See id.*

The Probation Office's revision to paragraph 21 does not cure the fatal deficiency in relying on **<u>any</u>** statement of Robert Johnson, Jr., whose statements have been proven false.  The Probation Office nonetheless determined that Defendant's role in the conspiracy should be attributed with 300 ounces (8,505 grams or 8.5 kilograms) based solely on statements of Robert Johnson, Jr.  Aug. 9, 2019 PSR, at ¶ 22.  As noted above, the Government must prove **relevant conduct** with **<u>reliable</u>** and **<u>specific</u>** evidence. *See United States v. Dabbs*, 134 F.3d 1071, 1081 (11th Cir. 1998).  There is nothing specific or reliable about the allegations contained in Paragraphs 21 through 24.  The probation office's conclusion is based solely on the uncorroborated and untested statements of a cooperating co-defendant, Robert Johnson, Jr., whom the Probation Office acknowledges has provided untruthful statements.  *See supra* & **Exhibit A and B**.  It should be noted that co-defendant Johnson entered into a plea agreement wherein he agreed to cooperate with the Government.  Accordingly, it is highly likely that Johnson self-servingly provided assistance against Defendant in furtherance of his own case and plea agreement and/or in the hopes of obtaining a more lenient sentence.

Most importantly, there is no other evidence corroborating Johnson's self-serving statements.  The Government seeks to base Defendant's sentence on an **<u>inference</u>** of conduct rather than actual **<u>evidence of conduct</u>**.  In addition to the untruthful statements addressed above, the Probation Office bases its weight calculations in large part on statements made by Johnson to the effect that Defendant made two purchases of cocaine per week in Jacksonville, Florida of 10

ounces per purchase, from March 2018 through June 14, 2018, for a total of 30 purchases [30 x 10(28.35)]. Aug. 9, 2019 PSR, at ¶ 22. Johnson also stated that Defendant traveled to Jacksonville to purchase cocaine on two occasions after the search warrant was executed at Defendant's residence on June 14, 2018. *Id.* at ¶¶ 15, 17. Notwithstanding why the Probation Office would disregard some of Johnson's statements as patently untruthful, yet blindly accept others, there is no actual evidence corroborating these statements; specifically, there is no actual evidence supporting this quantity of purchase. To the contrary, much like has already been noted, the objective evidence contradicts Johnson's statements.

First, as acknowledged by the Probation Office, the Title III on Nixon's phone, which the Government represented to the Court in its Application for the Title III was the primary method by which Nixon transacted his illegal drug transactions, only supports a weight of 3.6kg (not the 8.5kg which is derived solely from Johnson's statements). Second, the Government in fact conducted GPS tracking of Defendant over limited time periods in March of 2018 and September of 2018. This limited evidence does not corroborate Johnson's statements that Nixon was traveling to Jacksonville to purchase cocaine twice a week. From March 2, 2018 to March 31, 2018, part of the period in which Johnson claims that Nixon was traveling to Jacksonville twice per week to purchase cocaine, the GPS tracking information objectively proves that Nixon only traveled to Jacksonville on three (3) occasions over a four (4) week period (as opposed to the eight (8) trips that Johnsons alleges Nixon made). Likewise, from September 12 through September 25, 2018, the GPS tracking information objectively proves that Nixon only traveled to Jacksonville on one (1) occasion over a two (2) week period (as opposed to the four (4) trips that Johnsons alleges Nixon made). Although clearly possible, the Government failed to conduct GPS tracking evidence for April, May, June, July, or August of 2018. Where Johnson has already been proven to be a

liar, his the Probation Office should not base its calculations on Johnson's statements alone, where uncorroborated and in fact directly belied by the objective evidence. In short, the Probation Office cannot **infer** illegal conduct and weight where it lacks evidence of same.

In yet another example of the objective evidence undermining the credibility of Johnson's statements, Johnson stated that he sold Defendant cocaine for $916 per ounce, which the Government contends Nixon then resold for a profit. Aug. 9, 2019 PSR, at ¶ 17. The Probation Office attributes 8.5 kilograms, or 300 ounces to Defendant. *Id.* at ¶ 24. At the per-ounce rate Johnson claims, Defendant would have purchased $274,800 worth of cocaine from Defendant, which he then allegedly sold for more than $274,800. Yet, upon arrest, Defendant was found with only $1,329.00 in cash.[2] Moreover, Johnson stated that he sold 22 ounces of cocaine to Defendant shortly prior to his arrest, though Defendant only had 14 ounces of cocaine on him at the time of arrest. Aug. 9, 2019 PSR, at ¶ 16. Johnson's explanation was that Defendant "must have sold some of the cocaine prior to his arrest." *Id.* If Defendant had indeed sold that cocaine, he would have had significantly more money than the $1,329.00 on hand at the time of his arrest (at least $7,000 based on the wholesale price that Defendant was paying Johnson). Johnson's statements are once again completely uncorroborated by tangible evidence, and in fact, conflict with the physical evidence obtained at the time of Defendant's arrest.

This Court regularly cautions juries in criminal cases about the use or consideration of statements made by a cooperating co-defendant under a plea agreement, especially when they are not corroborated by other evidence, noting the obvious incentive that a cooperating co-defendant has to make false statements to gain a better deal. *See* Basic Criminal Instruction 1.2, *Eleventh*

---

[2] Further, the Probation Office found that Defendant has a negative net worth and no assets of value, and concluded that Defendant does not have the ability to pay a fine within the advisory guideline fine range. Aug. 9, 2019 PSR, at ¶ 91.

*Cir. Pattern Jury Instructions* (West 2010).  The Probation Office and this Court should exercise the same degree of caution and apply the same level of skepticism to Johnson's statements in the present context.  That caution and skepticism is most appropriate where, as here, certain of those statements indisputably are false, severely questioning Johnson's credibility with respect to any of his other statements.  An unreliable and self-interested witness, whose statements have been proven untrue, combined with a lack of actual evidence, cannot support a sentence based on the Probation Office's weight of 8.5 kilograms.

By contrast, the Probation Office concluded that Defendant could be attributed with 3.6 kilograms from Title III intercepts, but did not attribute Defendant "with any additional drug weight from the drug quantities identified during the wire taps in an effort to avoid double-counting." Aug. 9, 2019 PSR, at ¶ 23.  Indeed, the Government itself stated, in submitting one of its Title III wiretap applications on April 12, 2018, that the "communications [it was seeking to obtain through wiretapping] are expected to constitute admissible evidence against of the commission of [offenses by Defendant]."  Nearly all of the allegations about Defendant's offense conduct in the Presentence Investigation Report involve phone calls and text messages.  *See* Aug. 9, 2019 PSR, at ¶¶ 8-14.  Yet, the Probation Office states that Defendant can only be attributed with 3.6 kilograms of cocaine hydrochloride from these Title III intercepts.  *See id.* at ¶ 23.  In other words, the actual evidence supports no more than 3.6 kilograms of cocaine.  The Government therefore derives 4.9 kilograms of cocaine (8.5 minus 3.6) from the uncorroborated, and highly questionable, statements of Robert Johnson, Jr.  The Government cannot meet its burden to establish these additional 4.9 kilograms by a preponderance of the evidence.

10

While the Probation Office acknowledges that the 3.6 kilograms figure may include at least some double-counting,[3] and therefore should be even lower, Defendant submits that no more than 3.6 kilograms could be attributed to Defendant's role in the conspiracy, and that the Court should consider only the 3.6 kilogram figure because it is based on relevant and specific evidence, rather than the objectively untrue and self-serving statements of Robert Johnson, Jr. in a proffer interview.  Because the Probation Office admits that the 3.6 kilogram figure may include double-counting,[4] Defendant submits that 2 kilograms is the most appropriate approximation of his role. *See* Aug. 9, 2019 PSR, at ¶ 23 (noting issue with double-counting).

## II.  The Two-Point Enhancement Under U.S.S.G. § 2D1.1(b)(12) is Inapplicable as a Matter of Law and Fact.

The Presentence Investigation Report also incorrectly seeks to apply a two-level enhancement, alleging that Defendant "maintained 614 Old CCC Road, Brunswick, for drug distribution."  *See* Aug. 9, 2019 PSR, at ¶ 31; *see also* U.S.S.G. § 2D1.1(b)(12) ("If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels.").  The application of U.S.S.G. § 2D1.1(b)(12) is clarified by com. n. 17 as follows:

> **Application of Subsection (b)(12).--**Subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution.
>
> . . .
>
> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but **must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's**

---

[3] *See* Aug. 9, 2019 PSR, at ¶ 8 ("[N]o weights are attributed from the phone calls. . . .  The probation officer . . . asserts attributing weight from the phone calls would possibly result in double-counting."); *id.* at ¶ 23 ("[Defendant] has not been attributed with any additional drug weight from the drug quantities identified during the wire taps in an effort to avoid double-counting.").

[4] *See id.*

> **incidental or collateral uses for the premises**. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1(b)(12) com. n. 17 (emphasis added). As with any enhancement, "[t]he government [i]s required to prove the enhancement by a preponderance of evidence." *United States v. Casanova*, 677 F. App'x 545, 554 (11th Cir. 2017). For U.S.S.G. § 2D1.1(b)(12) to apply, "[t]he manufacture and distribution of controlled substances does not need to be the sole use of the premises, but it must be a **principal** one as opposed to a collateral one." *Id.* (emphasis added); *see also United States v. Guerrier*, 659 F. App'x 544, 546–47 (11th Cir. 2016) (holding U.S.S.G. § 2D1.1(b)(12) applied where "distribution of drugs was one of the 'primary or principal uses' of the house").

The Eleventh Circuit has noted the relative dearth of authority regarding this enhancement. *See United States v. Cintora–Gonzalez,* 569 F. App'x 849, 854 (11th Cir. 2014) (per curiam) ("Few circuits have addressed this guideline, and we have done so only in a single unpublished opinion." (citing *United States v. Vega,* 500 F. App'x 889, 891 (11th Cir. Dec. 11, 2012) (per curiam), as concluding that the district court did not plainly err in applying the enhancement where the defendant sold cocaine from his home on multiple occasions)); *see also Cowart v. United States,* 2016 WL 2984631, at \*4 (S.D. Ala. Mar. 29, 2016) ("To date, the Eleventh Circuit Court of Appeals has not addressed this guideline in a binding decision." (*citing Cintora-Gonzalez* and *Vega*)). However, unpublished, non-binding Eleventh Circuit decisions certainly provide guidance in determining proper application of the enhancement.

In *United States v. Tillman,* 535 F. App'x 844 (11th Cir. 2013), the Eleventh Circuit noted that § 2D1.1(b)(12) should be applied in accordance with the requirements of the "disorderly

house" statute,  21 U.S.C. § 856(a)(1).  *See id.* at 850 (citing Fair Sentencing Act of 2010, Pub.L.

No. 111–220, § (6)(2), 124 Stat. 2372, 2373 (2010)). The *Tillman* Court then stated:

> We have held the "critical elements" of the offense for a violation of § 856(a)(1) are (1) knowingly exercising some degree of control over the premises; (2) knowingly making the place available for the use alleged in the indictment; and (3) continuity in pursuing the manufacture, distribution, or use of controlled substances. We [have] rejected the contention that regular use of a premises "as a site from which to distribute cocaine is, by itself, sufficient" to constitute "maintaining" a premises, but rather stated that "[a]cts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity" constituted evidence of "maintaining."

*Id.* (citing *United States v. Clavis,* 956 F.2d 1079, 1090 (11th Cir.1992)); *see also United States v.*

*Elmore,* 586 F. App'x 559, 561–62 (11th Cir. 2014) (equating the requirements of 21 U.S.C. §

856(a)(1) with proper application of U.S.S.G. § 2D1.1(b)(12)).  In *Tillman*, the Eleventh Circuit

found the enhancement was properly applied where there was evidence that the defendant

"maintained" an apartment by "exercising some degree of control over the premises" and

"supervised" the same because out of all of the members of the conspiracy at issue who all

frequented the premises, that defendant was the one who appeared to exercise control.  *See Tillman*,

535 F. App'x at 851 ("[An agent] testified that, while he observed many members of the conspiracy

and 'random associates' frequenting the apartment late into the night, it was [defendant] who

would 'g[e]t up very early and tend[ ] to be over there.' Although other members of the conspiracy

also exercised some control over the apartment by conducting drug transactions there, [the agent's]

testimony indicates that it was [the defendant] who 'maintained' the apartment.").

Here, there is no evidence that distribution of drugs was the primary or principal use or

purpose of Defendant's residence at 614 Old CCC Road.  Admittedly, some drugs and drug

paraphernalia were located upon executed of a search warrant at the residence.  *See* Aug. 9, 2019

PSR, at ¶ 15.  The presence of drugs or related paraphernalia is not evidence sufficient to support

13

the conclusion that Defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance," as interpreted by the courts, set forth *supra*. *See* U.S.S.G. § 2D1.1(b)(12). Otherwise, every individual charged with distribution of drugs would receive a two-point enhancement simply if drugs or drug paraphernalia were found in the individual's house. This is not the intent of the sentencing enhancement, as is clear from the language of that provision itself and the courts' interpretation of same. The evidence located upon execution of the search warrant reflects nothing more than the fact that Defendant may have engaged in drug use and/or drug transaction at this residence, but the Eleventh Circuit has expressly "rejected the contention that regular use of a premises 'as a site from which to distribute cocaine is, by itself, sufficient' to constitute 'maintaining' a premises." *Tillman,* 535 F. App'x at 850. Accordingly, there is neither a legal or factual basis for application of the two-level enhancement set forth in U.S.S.G. § 2D1.1(b)(12).

## **CONCLUSION**

A correct application of the guidelines to this case results in a base offense level of not more than 26, a total offense level of not more than 23, and a guideline range of not more than 70-87 months.

RESPECTFULLY SUBMITTED this 4th day of December, 2019.

ROBERTS TATE, LLC

*/s/ Jason M. Tate*
Jason M. Tate
State Bar No. 140827
jtate@robertstate.com
ATTORNEY FOR DEFENDANT
MICHAEL ARTHUR NIXON

Post Office Box 21828
St. Simons Island, Georgia 31522
(912) 638-5200
(912) 638-5300-Fax

**<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned, do hereby certify that a copy of the foregoing **SENTENCING MEMORANDUM IN SUPPORT OF DEFENDANT MICHAEL ARTHUR NIXON'S OBJECTIONS TO AUGUST 9, 2019 PRESENTENCE INVESTIGATION REPORT** was served on all parties entitled to receive such service via the CM/ECF electronic filing system of this Court.

This the 4th day of December, 2019.

ROBERTS TATE, LLC

*/s/ Jason M. Tate*
Jason M. Tate
State Bar No. 140827
jtate@robertstate.com

ATTORNEY FOR DEFENDANT
MICHAEL ARTHUR NIXON

Post Office Box 21828
St. Simons Island, Georgia 31522
(912) 638-5200
(912) 638-5300-Fax

# Exhibit "A"

| | |
|---|---|
| **From:** | Sarah Railling <Sarah_Railling@gas.uscourts.gov> |
| **Sent:** | Thursday, July 25, 2019 2:14 PM |
| **To:** | Jason Tate |
| **Subject:** | update |

Good afternoon,
I spoke with the counselor at Dismas this afternoon regarding Mr. Nixon. She needs to pull Mr. Nixon's file out of storage too look into a few things further, but in speaking with her I believe your concerns are warranted regarding the statements about Mr. Nixon. She needs to verify any passes he may have had to leave the facility, but in speaking with her and speaking with one of the supervision officers here, they are in agreement with you that he would not have traveled to Jacksonville during the time period he was on electronic monitoring. I will get back in touch with you once she had reviewed his file. I believe after she contacts me it would beneficial for a conversation between you, Ms. Kirkland, and myself. Thank you.

Respectfully,

Sarah S. Railling
United States Probation Officer
Southern District of Georgia
Savannah Division
Office: (912)650-4160
Mobile: (912)675-5154
Fax: (912)650-4148

Exhibit "B"

| | |
|---|---|
| **From:** | Sarah Railling <Sarah_Railling@gas.uscourts.gov> |
| **Sent:** | Monday, August 12, 2019 8:29 AM |
| **To:** | Jason Tate; Kirkland, Jennifer (USAGAS) |
| **Subject:** | Michael Nixon |

Please be advised, the concluding sentence of paragraph 21 has been updated to read, "It should be noted, Nixon was a resident at Dismas Charities halfway house, Savannah, from April 11, 2017, through October 4, 2017. According to representatives at Dismas Charities, Nixon was on GPS monitoring for the duration of his supervision at Dismas Charities halfway house. For that reason, the probation officer did not attribute any drug weight based on statements made regarding that time period.

Thank you.


Respectfully,

Sarah S. Railling
United States Probation Officer
Southern District of Georgia
Savannah Division
Office: (912)650-4160
Mobile: (912)675-5154
Fax: (912)650-4148